**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 18-cr-00471-CMA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DAN WELCH,

     Defendant.

---

**DECLARATION OF ASSISTANT HEALTH SERVICES ADMINISTRATOR
ANGELA FELLOWS**

---

I, Assistant Health Services Administrator Angela Fellows, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above-titled matter. All attachments to this declaration are true and accurate copies of Federal Bureau of Prisons (Bureau) records maintained in the ordinary course of business.

**I.    Introduction**

     1.    I am the Complex Assistant Health Services Administrator (AHSA) with the Federal Bureau of Prisons (Bureau) at the Federal Correctional Complex in Florence, Colorado (FCC Florence). FCC Florence includes four separate institutions: the Federal Prison Camp (FPC) (minimum security), the Federal Correctional Institution (FCI) (medium security), the United States Penitentiary Florence – High Security (USP), and the United States Penitentiary Florence – Administrative Maximum (ADX).

     2.    I have been employed by the Bureau, in positions of increasing

responsibility, since July 2012. I have been the FCC Florence AHSA since December 2019.

3.      As part of my official duties as the FCC Florence AHSA, in collaboration with the Health Services Administrator and Clinical Director, I assist in managing and directing the activities of a multi-disciplinary team responsible for providing medical, dental, and allied health services (pharmacy, laboratory, and radiology) to the inmate population. I am also the assistant supervisor for mid-level providers, emergency medical technicians, and nurses.

4.      As part of my official job duties, I have access to records maintained in the ordinary course of business by the Bureau, including records concerning the operation of FCI Englewood, information maintained in the SENTRY[1] database, the Bureau Electronic Medical Record ("BEMR") database, and inmate central files.

5.      With respect to COVID-19, specifically, I am involved on a daily basis in the identification, planning, and implementation of all Bureau directives for preventing the spread of COVID-19 at FCC Florence, including FPC Florence. I have knowledge of both the Bureau's national directives relating to COVID-19 and the additional steps that FCC Florence, specifically, has taken to combat COVID-19 within the complex. Accordingly, through the course of my official duties, I have personal knowledge regarding the numerous measures, discussed below, that have been implemented both Bureau-wide and at FCC Florence in order to prevent and manage the spread of COVID-19.

---

[1] SENTRY is the Bureau's national database, which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, program participation, administrative remedies, and discipline history.

6.     The statements I make hereinafter are made based on my review of the official files and records of the Bureau, my own personal knowledge, or based on information acquired by me through the performance of my official duties.

## II.     Federal Inmate Dan Welch

7.     Federal inmate Dan Welch, Register Number 45012-013, is incarcerated at the Federal Prison Camp, FPC Florence in Florence, Colorado.  *See* Attachment 1, SENTRY Public Information Data at 1.  His projected release date is September 3, 2022, via good conduct time release.  *Id.*  Inmate Welch has served approximately 37.1 percent of his sentence with good conduct time earned and 31.7 percent of his full term. *Id.* at 3.

8.     Inmate Welch filed a request for Compassionate Release/Reduction in Sentence or Home Confinement under CARES Act standards with the FCI/FCP Warden on August 24, 2020.  *See* Attachment 2, Inmate Request to Staff and Response.

## III.     The Bureau's Authority to Place inmates on Home Confinement

9.     The Bureau's statutory authority to transfer prisoners to Home Confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  The Bureau's policy and procedures regarding Home Confinement are outlined in Bureau Program Statement 7320.01, *Home Confinement* and Bureau Operations Memorandum, *Home Confinement under the First Step Act*[2]  Both statutes set forth certain limitations with respect to the Bureau's transfer authority.  *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  However, pursuant to the Attorney General's directives in light of the COVID-19 pandemic, dated March 26, 2020, and April 3, 2020, *infra,* and given the surge in

_____

[2] *See* www.bop.gov via the Resources tab.

positive cases at select sites, the Bureau began immediately reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention (CDC), to determine which inmates are suitable for Home Confinement. Since the release of the Attorney General's original memorandum dated March 26, 2020, the Bureau has been prioritizing transfers to Home Confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic.

**IV.     Attorney General's Memorandum for the Director of the Bureau of Prisons, dated March 26, 2020**

10.     On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, Bureau utilizes Home Confinement, where appropriate, to protect the health and safety of Bureau personnel and people in Bureau's custody.  Pursuant to the March 26, 2020 Memorandum, Bureau has been prioritizing the use of its statutory authorities to grant Home Confinement for inmates in connection with the ongoing COVID-19 pandemic.  It was noted in the March 26, 2020 Memorandum that many inmates will be safer in Bureau facilities where the population is controlled and there is ready access to doctors and medical care.

11.     In assessing whether Home Confinement should be granted pursuant to the March 26, 2020 Memorandum, the Bureau considers the totality of circumstances for each individual inmate, the statutory requirements for Home Confinement, and the following non-exhaustive list of discretionary factors:

a.     The age and vulnerability of the inmate contracting COVID-19, in accordance with the CDC guidelines;

b.      The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities.

c.      The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a Bureau violation within the last year not receiving priority treatment;

d.      The inmate's score under PATTERN[3] (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment.

e.      Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her Bureau facility;

f.      The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, violent crimes, or terrorism, will render an inmate ineligible for Home Confinement.  Other serious offenses weigh heavily against consideration for Home Confinement.

12.      In addition to these factors, the March 26, 2020 Memorandum stated that before granting any inmate Home Confinement, the Bureau Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's

---

[3] For more information on PATTERN, please visit www.bop.gov via Inmates/First Step Act tab.

prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks Home Confinement. The Bureau will not grant Home Confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. The Bureau will grant Home Confinement only when it has been determined – based on the totality of circumstances for each individual inmate – that transfer to Home Confinement is likely not to increase the inmate's risk of contracting COVID-19.

13. On October 19, 2020, FCC Florence Health Services staff completed their review and determined inmate Welch does not qualify for a Reduction in Sentence. *See* Attachment 2 at 1. The review packet has been sent to the Warden to make a final determination. As of October 19, 2020, a final determination has not been made.

14. Moreover, the March 26, 2020 Memorandum noted that for the protection of the public, any inmate to whom the Bureau grants Home Confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a Bureau facility to Home Confinement. Inmates transferred to Home Confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

**V.     The CARES Act and the Attorney General's Memorandum for the Director of the Bureau of Prisons, dated April 3, 2020**

15. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for Home Confinement upon his finding of emergency conditions which are materially affecting the function of the Bureau. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the

Director for the Bureau of Prisons (April 3, 2020 Memorandum), authorized the Director to immediately maximize appropriate transfers to Home Confinement of all appropriate inmates held at Bureau facilities where the Director determines that COVID-19 has materially affected operations.

16.     The April 3, 2020 Memorandum specifically stated that the Bureau must move with dispatch in using Home Confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the Bureau continues to process the remaining inmates who are eligible for Home Confinement under pre-CARES Act standards.

17.     The April 3, 2020 Memorandum directed that the Bureau give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the Bureau should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020 Memorandum stated that the review should include a much broader pool of at-risk inmates – not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.  The assessment of all inmates remains guided by the factors in the March 26, 2020 Memorandum.

18.     For inmates deemed suitable candidates for Home Confinement, the April 3, 2020 Memorandum directed the Bureau to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate Bureau facility  The April 3, 2020 Memorandum further authorized the Bureau to, in appropriate cases, require that the inmate being transferred undergo his or

her 14 day quarantine in the residence to which the inmate is being transferred rather than in the Bureau facility from which the inmate is being transferred.

19.     The April 3, 2020 Memorandum also recognized that the Bureau has limited resources to monitor inmates on Home Confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the Bureau to transfer inmates to Home Confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

20.     Lastly, the April 3, 2020 Memorandum stated that it is essential for the Bureau to continue making determinations for Home Confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

**VI.     The Bureau's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda**

21.     The Bureau is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country.  The Bureau is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program.  The Bureau is then processing those inmates for transfer as expeditiously as possible.

22.     The Bureau is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the

Attorney General's directives.

23.     The Bureau has increased Home Confinement and is continuing to aggressively screen inmates for Home Confinement.  Since the March 26, 2020 Memorandum instructing the Bureau to prioritize Home Confinement as an appropriate response to the COVID-19 pandemic, the Bureau has placed an additional 7,837 inmates on Home Confinement.[4]

24.     Inmates do not need to apply to be considered for Home Confinement. Bureau Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for Home Confinement, any inmate who believes he or she is eligible may request to be referred to Home Confinement and provide a release plan or his or her Case Manager.

25.     It should be noted that for public safety reasons, in accordance with March 26, 2020 Memorandum, and to ensure the Bureau is deploying its limited resources in the most effective manner, the Bureau is currently assessing a number of factors to ensure that an inmate is suitable for Home Confinement including, but no limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

26.     Additionally, the Bureau has generally prioritized Home Confinement consideration for those inmates who have served a certain portion of their sentences, or

_____

[4] *See* www.bop.gov.

who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in Bureau's discretion in certain circumstances and are subject to revision as the situation progresses, Bureau is, at this time, prioritizing consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences. As Bureau processes the inmates eligible for Home Confinement under these criteria and learns more about the COVID-19 pandemic and its effect on Bureau facilities, it is assessing whether and how to otherwise prioritize consideration.

27.     As of May 13, 2020, before the Bureau approves an inmate for Home Confinement who does not meet the criteria outlined by the Attorney General, the Bureau provides notice of its consideration to the United States Attorney's Office that prosecuted the inmate so that the United States Attorney's Office is given an opportunity to provide additional information, including information from victims, which might be relevant to the analysis. The United States Attorney's Office then has three business days to provide any additional information to the Bureau. The Bureau retains full discretion to make the decision with or without this input based on a flexible consideration of the criteria and the totality of the circumstances, including the risks associated with the COVID-19 virus. The notification requirement will not be applied to inmates approved for Home Confinement prior to this requirement's adoption on May 13, 2020.

28.     If the incarcerated individual does not qualify for Home Confinement under Bureau criteria, an inmate may be reviewed for placement in a Residential Reentry

Center (RRC) and possibly Home Confinement at a later stage in accordance with applicable laws and Bureau policies.

**VII. National Steps Taken by the Bureau to Address COVID-19[5]**

29.     In response to the pandemic, the Bureau has taken significant measures to protect the health of inmates in its charge.  These steps include, but are not limited to, the following:

a.     Beginning August 5, 2020, the Bureau implemented Phase Nine of the Nationwide Action Plan, which includes an extension of previously disseminated guidance and currently governs operations.  The current modified operations plan allows for limited group gathering with extra attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Additionally with Phase Nine, Evidence-Based Recidivism Reduction Programs and Productive Activities will resume with social distancing modifications.

b.     All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.

c.     Every newly admitted inmate is screened for COVID-19 and tested by Quest commercial lab for COVID-19.  Asymptomatic inmates are placed in quarantine status for fourteen days with twice-daily temperature checks and

_____

[5] The Bureau's national guidance has undergone a number of changes in response to the evolving threat. The Bureau has established a COVID-19 resource section on its public webpage, which is available at: https://www.bop.gov/coronavirus/.  This webpage includes updates on the Bureau's response to COVID-19 and positive COVID-19 tests among inmates and staff at Bureau institutions nationwide.

twice-daily screening of signs and symptoms.  Symptomatic inmates are placed

in isolation until they test negative for COVID-19 as directed by CDC guidelines.

Additionally, all staff are screened for signs and symptoms prior to entering the

institution.  Any staff member registering a temperature of 100.4 degrees

Fahrenheit or higher are not permitted beyond the screening site.

d.      Contractor access to Bureau facilities is restricted to only those

performing essential services (e.g. medical or mental health care, religious, etc.)

or those who perform necessary maintenance on essential systems.  All

volunteer visits have been suspended, unless authorized by the Deputy Director

of the Bureau.  Any contractor or volunteer who requires access are screened for

symptoms and risk factors.

e.      Legal visits may be permitted on a case-by-case basis after the

attorney has been screened for infection in accordance with the screening

protocols in place for prison staff, contractors, and visitors.

f.      Social visits resumed on October 3, 2020.  Visitation is non-contact

only.  The number of visitors allowed in the visiting room is based on the size of

the available space to ensure that there are 6+ feet between each visitor area.

The frequency and number of visitors is adjusted to ensure all inmates have an

opportunity to visit at least twice a month.  Visiting appointments and/or adjusting

visiting times may be necessary.  Consideration will be given to the time needed

to clean between visitor groups.  Tables, chairs, and other high-touch surfaces

must be disinfected between visitation periods.  Visiting will be conducted as a

cohort so that inmates living in the same living group will visit at the same time to

limit the potential exposure to inmates in different housing units. Inmates in
quarantine or isolation will not participate in social visiting. Visitors will be
symptom screened and temperature checked upon entry. Staff will wear
appropriate PPE when interacting with incoming visitors. Both inmates and
visitors must wear face coverings at all times and perform hand hygiene before
and after the visit.

30.     Further details and updates of Bureau's modified operations are available
to the public on the Bureau website at a regularly updated resource page.[6]

**VIII.    Steps Taken at FCC Florence to Address COVID-19**

31.     In addition to the steps taken at the national level, FCC Florence itself has
also taken a number of additional measures in response to the COVID-19 pandemic.

32.     As a result of the COVID-19 threat, a Command Center at FCC Florence
was activated. This Command Center works together and, in conjunction with the
Central Office Command Center and North Central Regional Command Center, to
monitor, plan, and implement national directives and other procedures at FCC Florence.
The FCC Florence Command Center is currently scheduled to remain active for an
indeterminate period of time and is staffed from 6:00 a.m. to 4:00 p.m., Monday through
Friday.

33.     FCC Florence has taken myriad steps to prevent the introduction and
spread of COVID-19 into its facilities, including providing inmate and staff education;
conducting inmate and staff screening; putting into place testing, quarantine, and
isolation procedures; ordering necessary cleaning, testing, and medical supplies;

---

[6] www.bop.gov/coronavirus/index.jsp

engaging in enhanced cleaning and disinfecting measures; and taking a number of other preventative measures. I will discuss each in turn, below.

34.     From the outset of the COVID-19 pandemic, FCC Florence officials have provided regular updates to inmates regarding the virus and the Bureau's response, and have educated inmates regarding measures that they themselves should take to stay healthy.  Additionally, informative posters have been posted throughout the institution detailing the importance of good hygiene and hand washing.

35.     In addition to providing education to inmates, FCC Florence staff have been similarly educated regarding the importance of washing their hands, not touching their face, maintaining appropriate social distancing, and cleaning/disinfecting all equipment, including their uniforms. Medical staff provided training to correctional staff on how to appropriately don and remove Personal Protective Equipment (PPE).

36.     FCC employees complete regular "COVID-19 inspections" of the institution and document their efforts.  *See* Attachment 3, COVID-19 Compliance Committee Memorandum (August 12, 2020) and Inspection Findings Form.  A Daily Sanitation Log is completed on a daily basis.  *See* Attachment 4, Daily Sanitation Log form.

## IX.     Screening for COVID-19 at FCC Florence

37.     Inmate movement at FCC Florence is currently highly restricted.  The following screening measures for both inmates and staff are currently in place, and will remain in effect even after the "Stay in Shelter" order is lifted, until Bureau officials determine that they are no longer necessary to prevent and/or manage the introduction or spread of COVID-19 at any of the institutions at FCC Florence.

**Inmates**

38.     *Incoming/Outgoing Inmates:*  FCC Florence screens all arriving inmates immediately upon their arrival.  These screening procedures are as follows:

a.     When inmates arrive at the institution, they are met by Health Services medical providers, who conduct an initial screening for symptoms of COVID-19 (including fever, cough, and shortness of breath), as well as for "exposure risk factors," including whether the inmate has traveled from, or through, any locations identified by the CDC as increasing epidemiologic risk within the past 14 days, or has had close contact with anyone diagnosed with COVID-19 in the post 14 days.  *See* Attachment 5, Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool.  Health Services medical providers wear PPE during these interactions.  Inmates are tested for COVID-19 at this time then escorted to quarantine.

b.     These screening procedures apply to all incoming FCC Florence inmates, no matter which of the four institutions they are designated to be housed, and these inmates are initially screened at FCI Florence as opposed to their designated institutions. When inmates arrive at the institution, they are met by Health Services medical providers, who conduct this initial screening in a designated area at FCI Florence separate from other staff and inmates. Health Services medical providers wear PPE during these interactions.

c.     All inmates releasing or transferring from FCC Florence are placed in quarantine for 21 days prior to their scheduled departure from the institution. While in quarantine, if the inmate is transferring from FCC Florence to another

institution, the inmate, in addition to the daily symptom and temperature checks, is tested for COVID-19 on day 1 of quarantine and day 14 of quarantine. The transferring inmate must be moved within 14 days of receiving a negative test result on the second test, but can be transferred sooner. If the inmate is releasing to the community from FCC Florence, the inmate, in addition to the daily symptom and temperature checks, is tested for COVID-19 on day 1 and day 14 of quarantine.

39. *General Population:* Inmate movement within FCC Florence is currently limited on a modified schedule designed to maximize social distancing and allow departments to maintain sanitation regulations and minimize the risk of infection. All inmates are encouraged to self-monitor and to report symptoms of illness to unit staff either orally or via a written request to staff, commonly referred to as a copout. All inmates were provided with three cloth masks that can be sent out for cleaning with their laundry, and are required to use them when social distancing is not possible. Medical staff are required to be present in each housing unit daily to conduct sick call and pill line. The presence of medical providers affords inmates further opportunity to report any medical concerns. In addition, unit staff and other department representatives (including staff from education, commissary, psychology, and recreation) are required to conduct daily rounds in each housing unit in order to ensure that the inmate population remains safe and healthy. If an inmate has an issue that he wants to bring to the staff's attention, he can do so via a written request at any time, or during these rounds with staff

40. *At Risk Individuals.* As the FCC Florence AHSA, I am responsible for

reviewing, in conjunction with a small team of medical providers, inmate medical records in order to determine which individuals at FCC Florence are considered "high risk" for COVID-19 pursuant to CDC guidelines. Per CDC guidance, "high-risk" individuals include those over 65 years old[7] and/or those with certain underlying medical conditions.[8]

41.     In order to identify which inmates at FCC Florence should be considered "high risk," our team searched the Bureau's medical records for (1) all inmates aged 55 and over[9]; and (2) all inmates who have been diagnosed with a condition identified by the CDC as being "high risk."

42.     Based on this search, we compiled a list of individuals at FCC Florence considered to be "high risk" based on these established CDC criteria. During the week of March 16 through March 20, 2020, we screened each of these high-risk individuals for the same "exposure risk factors" identified above, and conducted temperature checks for all high-risk inmates. We also provided these inmates additional education regarding COVID-19 prevention, and advised them to seek medical care immediately if they began to develop any symptoms.

43.     *Inmates with Work Details.*  FCC Florence is also conducting enhanced screening for all inmates with ongoing work details, such as food service, cleaning orderlies, and general maintenance.  These functions are considered to be "essential." Each of these inmates is screened for illness before each of their assigned work details. This includes being screened for any symptoms of illness and having their temperature

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html
[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html
[9] We chose to search for inmates 55 and over, rather than 65 and older, in an abundance of caution and to be conservative in our approach to assessing risk.

taken.

44.     All of the inmates that have tested positive for COVID-19 at FCC Florence have been recent transfers.  With the first inmate positives, FCC Florence started adhering to the following procedures:  *See* Attachment 6, Memo – Isolation Procedures for a Positive Case.

a.     Any inmate who presents with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health Services Department. Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate.

b.     If any inmate is isolated, the inmates housed in the same housing unit with him will be quarantined pending results of a COVID-19 test provided to the inmate, or 14 days, whichever is sooner.

c.     Inmates may also be placed in a quarantine or isolation setting if they are exposed to a person with COVID-19, where they will be monitored daily for a period of at least 14 days.  Quarantine or isolation will only be discontinued once 14 days elapse without the inmate(s) developing new symptoms.

d.     FCC Florence Health Services medical providers are prioritizing immediate medical care for anyone who claims symptoms indicative of a COVID-19 infection.

45.     As of the date of this submission, fifty-nine FCC Florence inmates have tested positive for COVID-19.  Forty-two of these inmates are assigned to Florence FCI, two are assigned to the Federal Prison Camp, with the remaining fifteen assigned to the Florence USP.  Fifty-four of these inmates have recovered from COVID-19, with the

remaining five considered asymptomatic.   Every positive inmate test now attributed to FCC Florence was the result of an inmate transferring into the institution, including inmates that tested positive at other correctional institutions.  If a prior positive was recorded by the submitting institution, that inmate is recorded as a positive case, regardless of the result of the COVID-19 test administered upon arrival.  Additionally, eleven staff members have tested positive for COVID-19, with only one of those staff members assigned to the Federal Prison Camp.

46.     After these positive tests for both inmates and staff, contact investigations were conducted (if applicable) and individuals who possibly came in contact with the positive staff members or inmates were alerted.  Numerous memos and alerts were released informing applicable FCC Florence staff of the results as well.

**Staff and Victors**

47.     All individuals entering FCC Florence, including staff, delivery drivers, or any other visitors, must undergo a health screening upon entry.  This includes having their temperature taken.  This screening is conducted by staff wearing a face covering, gloves, and eye protection.

48.     The individuals conducting this health screening prior to the front entrance of FCC Florence are authorized to deny entry to any individual if he or she has a body temperature of 100.4 degrees Fahrenheit, or above, or reports other symptoms consistent with COVID-19 (although they may consult with FCC Florence medical providers in advance of the decision to deny entry).

49.     This screening applies to *all* staff and visitors, including those who leave the grounds of FCC Florence even for a short duration of time, such as to purchase

lunch.

50.     The FCC Florence employees have also been educated regarding the importance of staying home if they are feeling ill, and are required to self-report any COVID-19 exposure (known or suspected) as well as any positive COVID-19 test.  If a symptomatic staff member is tested for COVID-19, they are not permitted to return to work until after receiving the results of the test.

51.     Staff members were provided with three cloth masks and are instructed to use them in situations where social distancing is not possible, or when interacting with inmates.  Additionally, staff are encouraged to follow the "best practices" as listed by the CDC, including staying home if they are sick, washing hands appropriately and often, the appropriate method to cough/sneeze to lessen the chance of exposure, cleaning commonly touched areas, and social distancing.

**COVID-19 Testing at FCC Florence**

52.     The CDC has identified four "priority levels" for testing individuals with a suspected COVID-19 infection.  *See* Attachment 7, CDC Priorities for Testing Patients with Suspected COVID-19 Infection.  Priority levels one through three include hospitalized patients and healthcare workers with symptoms (Priority Level 1); symptomatic patients in long-term care facilities, individuals 65 years or older, individuals with underlying conditions, and first responders (Priority Level 2); and symptomatic critical infrastructure workers, individuals who do not meet any of the criteria in Priority Levels 1 or 2, healthcare workers and first responders, and individuals with mild symptoms in communities experiencing high numbers of COVID-19 hospitalizations (Priority Level 3).  *Id.*  The fourth, or non-priority level, is for individuals

without symptoms. *Id.*

53.     At FCC Florence, the decision whether to test an inmate for COVID-19 is made by Bureau medical providers based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk," and (4) whether the inmate is on a work detail, such as food service, that requires the inmate to interact with other inmates or staff.

**Additional Measures to Combat COVID-19.**

54.     In addition to the above steps, FCC Florence has taken a number of additional measures to combat COVID-19.

55.     First, with respect to staff specifically:

a.     Correctional staff have been provided PPE to be used in appropriate locations throughout FCC Florence such as quarantined areas, isolation units, and screening sites. FCC Florence has sufficient PPE on hand, including N-95 respirator masks, surgical masks, and rubber gloves, to meet its current and anticipated needs, as well as the ability to order additional PPE should the need arise.

b.     On April 5, 2020, all staff were provided protective face masks for daily use. Since then, staff were provided with three cloth masks. Staff are required to wear these masks at all times when six-foot physical distancing measures cannot be observed. Staff are also required to keep a mask with them at all times in the event that social distancing cannot be maintained.

c.     FCC Florence has limited the number of in-person meetings

scheduled onsite for staff. If such meetings take place, they are limited to 10 people and must be conducted in areas permitting individuals to maintain an appropriate distance from one another. FCC Florence has also implemented a video-conferencing system to replace in-person meetings to the extent practicable.

d.      Correctional staff are required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the control center and again upon their return. Staff also have regular, consistent access to soap and hand sanitizer.

e.      Correctional staff entering more than one institution during a shift has been minimized.  However, if a staff member does have to enter a second institution, they must clear the screening procedures, including a temperature check, prior to entering the second institution.

56.      Second, all inmates have access to sinks, water, and soap at all times. New inmates admitted to any institution at FCC Florence automatically receive soap. And all inmates may receive new soap weekly, either by purchasing soap in the commissary, or free of charge for qualifying inmates.  Finally, FCC Florence inmates' laundry is collected and washed regular basis.

57.      Third, all common areas in inmate housing units are cleaned daily, and are typically cleaned by inmate orderlies multiple times throughout the day, with a designated disinfectant that kills human coronavirus. Common areas outside inmate living areas, including the lobby, bathrooms, corridors, etc., are also cleaned with the same disinfectant on a daily basis (and often multiple times per day).  Each housing unit

has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean both the common areas and their cells on a daily basis.

## X.   CONCLUSION

58.     In sum, the Bureau and FCC Florence take the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population.  The various phases of the Bureau's Action Plan have been designed and implemented in a systemic manner both nationally and at FCC Florence in order to mitigate the spread of COVID-19.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


Executed on this 19th day of October 2020, in Florence, Colorado.


Angela Fellows,
Assistant Health Services Administrator
FCC Florence, Colorado


**Enclosures**

| | |
|---|---|
| Attachment 1, | SENTRY Public Information Data. |
| Attachment 2, | Inmate Request to Staff and Response. |
| Attachment 3, | COVID-19 Compliance Committee Memorandum (August 12, 2020) and Inspection Findings Form. |
| Attachment 4, | Daily Sanitation Log form. |
| Attachment 5, | Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool. |

Attachment 6,        Memo – Isolation Procedures for a Positive Case.

Attachment 7,        CDC Priorities for Testing Patients with Suspected COVID-19
                     Infection.

# ATTACHMENT 1

```
REGNO..: 45012-013 NAME: WELCH, DAN

                   RESP OF: FLF
                   PHONE..: 719-784-9100    FAX: 719-784-9504
                                            RACE/SEX...: WHITE / MALE
                                            AGE:  57
PROJ REL MT: GOOD CONDUCT TIME RELEASE      PAR ELIG DT: N/A
PROJ REL DT: 09-03-2022                     PAR HEAR DT:
```

G0002      MORE PAGES TO FOLLOW . . .

```
   REGNO..: 45012-013 NAME: WELCH, DAN

                   RESP OF: FLF
                   PHONE..: 719-784-9100   FAX: 719-784-9504
   HOME DETENTION ELIGIBILITY DATE: 04-30-2022


   THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
   THE INMATE IS PROJECTED FOR RELEASE:  09-03-2022 VIA GCT REL

   ----------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

   COURT OF JURISDICTION...........: COLORADO
   DOCKET NUMBER...................: 1:18-CR-00471-CMA-1
   JUDGE...........................: ARGUELLO
   DATE SENTENCED/PROBATION IMPOSED: 08-21-2019
   DATE COMMITTED..................: 09-12-2019
   HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
   PROBATION IMPOSED...............: NO


                   FELONY ASSESS  MISDMNR ASSESS  FINES         COSTS
   NON-COMMITTED.: $100.00        $00.00          $00.00        $00.00

   RESTITUTION...: PROPERTY:  NO  SERVICES:  NO       AMOUNT: $938,726.15

   -----------------------CURRENT OBLIGATION NO: 010 --------------------------
   OFFENSE CODE....: 820      COMMUNICATIONS ACT
   OFF/CHG: 13 U.S.C. 1343: WIRE FRAUD

    SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
    SENTENCE IMPOSED/TIME TO SERVE.:    42 MONTHS
    TERM OF SUPERVISION............:     3 YEARS
    DATE OF OFFENSE................: 04-30-2017
```

```
REGNO..: 45012-013 NAME: WELCH, DAN

              RESP OF: FLF
              PHONE..: 719-784-9100  FAX: 719-784-9504
-----------------------CURRENT COMPUTATION NO: 010 -----------------------
```

COMPUTATION 010 WAS LAST UPDATED ON 09-12-2019 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 09-12-2019 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

```
DATE COMPUTATION BEGAN..........: 09-12-2019
TOTAL TERM IN EFFECT............:    42 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:     3 YEARS       6 MONTHS
EARLIEST DATE OF OFFENSE........: 04-30-2017

JAIL CREDIT.....................:    FROM DATE    THRU DATE
                                    11-09-2018    11-09-2018

TOTAL PRIOR CREDIT TIME.........: 1
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 188
TOTAL GCT EARNED................: 54
STATUTORY RELEASE DATE PROJECTED: 09-03-2022
ELDERLY OFFENDER TWO THIRDS DATE: 01-09-2022
EXPIRATION FULL TERM DATE.......: 03-10-2023
TIME SERVED.....................:     1 YEARS       1 MONTHS       9 DAYS
PERCENTAGE OF FULL TERM SERVED..: 31.7
PERCENT OF STATUTORY TERM SERVED: 37.1

PROJECTED SATISFACTION DATE.....: 09-03-2022
PROJECTED SATISFACTION METHOD...: GCT REL
```

```
G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

# ATTACHMENT 2

# Reduction in Sentence Eligibility Review

Before completing this review, please read Program Statement 5050.50, Compassionate Release/Reduction in Sentence (RIS). Inmates may qualify for a RIS under several categories as outlined below:

## INMATE INFORMATION

| Inmate Name | Reg. No | Inmate DOB/Age |
|---|---|---|
| Welch, Dan | 45012-013 | 02/19/1963/57 |

| Institution | Category Inmate is requesting a Reduction in Sentence |
|---|---|
| FCC Florence-FPC | Med Terminal ☐  Debilitated Medical Condition ✓  Elderly Med (65/50%) ☐ |

## MEDICAL WITH A TERMINAL DIAGNOSIS (Category: Med Terminal)

| 1. | Does the inmate have a documented medical diagnosis from a physician with a prognosis of life expectancy of 18-months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1)? | ☐ Yes | ✓ No |
|---|---|---|---|

If yes, complete a comprehensive medical summary to include IADL & ADL worksheet. Contact Clinical Director. If no, inmate does not qualify under this category.

## DEBILITATED MEDICAL CONDITION

| 1. | Does the inmate have a documented medical diagnosis of an incurable, progressive illness or has the inmate suffered a debilitating injury from which he/she will not recover? | ☐ Yes | ✓ No |
|---|---|---|---|
| 2. | AND, is the inmate completely disabled, unable to perform activities of daily living and totally confined to a bed or chair OR is the inmate only capable of limited self-care and confined to a bed or chair more than 50% of waking hours? | ☐ Yes | ✓ No |

If yes, complete a comprehensive medical summary to include IADL & ADL worksheet. If "No" is checked for either of the above items the inmate does not qualify under this category.

## INMATES AGE 65 OR OLDER WITH A MEDICAL CONDITION (Category: Elderly Med Condition/65/50%)

| 1. | Is the inmate age 65 or older and has the inmate served at least 50% of their sentence (verify with Unit Team)? (If no, inmate does not qualify under this category. If yes, proceed to next question.) | ☐ Yes | ✓ No |
|---|---|---|---|
| 2. | Does inmate suffer from a documented chronic or serious medical condition? | ☐ Yes | ☐ No |
| 3. | Has the inmate experienced a deteriorating mental or physical health condition that substantially diminishes his/her ability to function in a correctional environment? | ☐ Yes | ☐ No |
| 4. | Will conventional treatment provide a substantial improvement to the inmate's mental or physical condition? (If yes, inmate does not qualify under this category) | ☐ Yes | ☐ No |

Either item 2 or 3 above must be checked "Yes" for inmate to qualify under this category. If yes, complete a comprehensive medical summary to include IADL & ADL worksheet. If no, inmate does not qualify under this category.

## ELIGIBILITY DETERMINATION

Inmate may qualify for a RIS under the following category:

Med Terminal ☐     Debilitated Medical Condition ☐     Elderly Med (65/50%) ☐

Inmate Does not qualify for a RIS ✓

## STAFF INFORMATION

| Name of staff person completing this review | Position | Screening Date |
|---|---|---|
| CAPT William Resto-Rivera MD | CD | 10/19/20 |

| Clinical Director Signature | Date |
|---|---|
| | 10-19-20 |



FCI Florence, CO ·

Form: Inmate Request for Compassionate Release Consideration

| TO: WARDEN C. CARTER | DATE: 8/21/20 |
|---|---|
| FROM (print): DAN WELCH | REGISTER NO: 45012-013 |
| Signature: *(signature)* | UNIT: Summit |

Instructions: In order to be considered for Compassionate Release, you must complete this form and send it to the Unit Team. The information will be used to determine if your request for Compassionate Release meets the minimum guidelines for consideration, as referenced in the Program Statement 5050.50, Compassionate Release/Reduction in Sentence.

1.     Check the category you are requesting Compassionate Release Consideration: (**only one per request**)

☐ Request based on Medical Circumstances
  ☐     Medical Terminal (estimated life expectancy of 18 months or less) _____
  ☐     Medical Debilitated (completely disabled, unable to perform activities of daily living and totally confined to a bed or chair OR only capable of limited self-care and confined to a bed or chair more than 50% of waking hours)

☐ Request based on Non-Medical Circumstances-Elderly Inmates
  ☐   Request based on Elderly Inmates over 65 with Medical Conditions who have served more than 50% of sentence
  ☐   Request based on inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced
  ☐   Request based on Elderly Inmates over 70 who have served 30 years or more of their term of imprisonment (offense that occurred on or after November 1, 1987)

☒ Request based on Death or Incapacitation of the Family Member Caregiver where you are the only caregiver for your minor child
☐ Request based on Incapacitation of a Spouse or Registered Partner where you are the only available caretaker

2.     Explain the extraordinary or compelling circumstances, which could not have been foreseen at the time of your sentencing you believe warrant Compassionate Release consideration. Continue on back, if necessary. SEE ATTACHED "EXTRAORDINARY CIRCUMSTANCES"
My MINOR DAUGHTER HAS NO PARENT TO TAKE CARE OF HER.

3.     Explain your proposed Release Plans and continue on back, if necessary. The information should include the following detailed information:
  1. Address and phone number of where you plan to live.
  SEE ATTACHED FAMILY CONTACTS

  2. Your family supports in the community.
  SEE ATTACHED FAMILY CONTACTS AND LETTER FROM PAUL LEWIS

  3. How you plan to cover your medical expenses and support yourself.
  SEE ATTACHED JOB OFFER

  4. Where continued health treatment and services will be received.
  SEE ATTACHED "HEALTH TREATMENT".

**Sensitive Limited Official Use Only**
A copy of this form will be kept in the Medical Record section 6 and Inmate's Central File, and the original will remain with the Medical Social Worker.
June 2019

RECEIVED
WARDEN'S OFFICE
AUG 2 4 2020
FCI FLORENCE

**Extraordinary Circumstances:**

The base circumstance is not new and is acknowledged in my pre-sentence report Addendum in the governments response where they are willing to give me more time to make arrangments for my daughter. See Attached Addendum to the pre-sentence report.

I have been taking care of my youngest daughter, Taia(16), until I was incarcerated. Taia's mother moved away from her in 2014. Taia has been living with me full-time for over 6 years and never once stayed with her mother, as their relationship has been very rocky and troubling. Taia has seen her mother a few times over these years but even a short visit ended with Taia in tears or some kind of incident.

Since my imprisonment, Taia has been staying with her older sister Jordan, who has taken good care of her. However, when the COVID-19 pandemic hit, Jordan was worried about her two young children, ages 4 and 2, she is also pregnant and expecting her 3rd child in January, worried about her children getting infected and decided it would be best for Taia to try living with her mother. Since then, after a very short time, Taia's motherdropped her off back at Jordan's and told her "if she did not get out she would call the cops". Taia has since moved in with her other sister and her husband and their 2 year old son. This was the last place for Taia to go. Taia is not her sisters responsiblilty. She should be under her parents care, which in this case is not her mother. Her mother has a well documented alcohol problem with a recent DUI conviction.I am concerned she could end up in foster care, especially with the COVID-19 pandemic going on. It is necessary for me to provide for my daughter financially and guide her emotionally and is safe and has a bright future she deserves.

Because of the urgency imposed by such an unforseen event, Global Pandemic COVID-19, and an incapable mother, it is important to consider these factors and find **Extraordinary and Compelling** reasons warrant my compassionate release and sentence reduction.

**Proposed Release Plan:** I will live with my daughter Christin and her Husband Steven for 1 month, until I can find a place to rent I have a job offer waiting for me (See attached job offer) that will also have health care benefits. See attached address and phone number for Christin and Steven Larsen.

**Family supports in the community:**

I have 3 dauthers and 2 sons. See attached family addresses. I also have many good friends and nieghbors as well as church leaders. See attached letter from Paul Lewis.

**Plans to suopport myself and medical expenses:**

I have a job waiting for me the day I get out that will allow me a good living as well as healthcare benefits. See attached job offer.

**Contined Health treatments:**

At this time I have no health issues and if something comes up for me or my daughter, they will be coverage through my health benefit package from job.

# ADDENDUM TO THE PRESENTENCE REPORT

## UNITED STATES DISTRICT COURT FOR DISTRICT OF COLORADO
### UNITED STATES VS. DAN WELCH
### DOCKET NUMBER: 1082 1:18CR00471-1

At sentencing, the Court must—for any disputed portion of the Presentence Report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the Court will not consider the matter in sentencing. Fed. R. Crim. P. 32 (i)(3)(B).

## OBJECTIONS BY THE GOVERNMENT

As of August 12, 2019, the Probation Office has not been advised of any objections by the Government.

On July 31, 2019, the Government file **Document 31**, Government's Sentencing Statement and Position Relative Tt 18 U.S.C. § 3143(a). The Government submits self-surrender would be appropriate in this case.

## OBJECTIONS BY THE DEFENDANT

On July 30, 2019, the defendant, through defense counsel, filed **Document 30**, Position of Defendant With Respect to the Presentence Report. The defendant advises he has no objections to the report.

On August 7, 2019, the defendant, through defense counsel, filed **Document 32**, Motion for Variance and Downward Departure. In the motion, the defendant requests a downward departure pursuant to §4A1.3(b) because he believes his Criminal History Category II substantially overrepresents the seriousness of his criminal history. Additionally, the defendant is requesting a downward variance based on his parental responsibilities. The defendant is requesting a sentence of probation which would include a period of home confinement and community service.

Government's Response: On August 9, 2019, the Government filed **Document 33**, Government's Response to Motion for Variance and Downward Departure [ECF 32]. The Government submits its belief that the defendant's prior convictions warrant that he remains in Criminal History Category II. Further, the Government submits a downward variance to probation "would unduly minimize the serious nature of the offense committed primarily grounded on the size of the loss to the victim." The Government notes if a term of incarceration is imposed, the Court could order a longer time for the defendant to voluntary surrender to the Bureau of Prisons to provide him time to make arrangements for his daughter.

Probation's Response: The Probation Office does not believe Criminal History Category II overrepresents the seriousness of the defendant's criminal history. Additionally, the Probation Office does not believe a downward variance is warranted in this case. The Probation Office continues to recommend a sentence of 42 months incarceration for reasons noted in the Justification section of the presentence investigation report.



Lease and Factor

Aspire Lease and Factor
949- 478-2670
www.AspireLeaseAndFactor.com

Re: Dan Welch 45012-013

To Whom It May Concern:

We are hopeful that accommodations can be made for the early release of Dan Welch. We hold Dan in high regard and have employment available for him upon his return.

We believe that stable employment is important for Dan's transition back to the community. We are familiar with Dan's skills and talents. It is our pleasure to hold a position available for Dan in our fleet management department. We look forward to his safe and expeditious return.

Please don't hesitate to contact me with any questions. We look forward to supporting Dan.

Best Regards,

*Eric Richardson*

*VP Sales/Operations*

*Aspire Lease and Factor LLC*

ericr@aspireleaseandfactor.com

*tel. 801.935.5506*

August 4, 2019

Judge Cristine M Arguello
US District Court
Colorado, USA

Dear Honorable Judge Arguello,

I am honored that Dan Welch would confide in me in asking that I write a letter of reference to the court. I have known Dan intimately for 5 years and we have had a longer acquaintance prior. I served as an LDS Bishop for Dan and his family and currently live across the street from Dan. I consider Dan a dear friend and brother.

I wish the court to know that Dan is a very good man. Dan has a very kind heart, and his nature is such that he is always looking beyond himself. He has helped many families in our neighborhood. Those that live in our neighborhood have benefited from Dan's goodness and kindness.

I have appreciated Dan, both as a neighbor and congregationalist, for his forthright nature, service, and willingness to take responsibility for his actions. As Dan outlined the proceedings from the last year, I feel he has been very forthcoming about his business transactions with investigators because that is the type of person Dan is. I know that Dan is remorseful for his actions and circumstances and will never hide from making things right.

As consideration is made for Dan's sentencing I hope the court considers the welfare of Dan's 15 year old daughter, Taia. Dan is an amazing and invested father. For the past 5 years, Dan has been the primary caretaker of Taia. He is the primary provider for her physical, emotional, spiritual, and mental well being. He is invested in her schooling, extracurricular activities and his life completely centers around Taia when he is home. I am concerned for Taia's well-being if Dan goes to prison and I hope that the court will consider her welfare as decisions are made.

Thank you for considering the thoughts expressed here. I know that Dan will want to make things right and I hope that a balance is struck with justice and mercy as consideration is made for both Dan and his daughter, Taia.

Kindest regards,

Paul R. Lewis
10346 N Sandalwood Dr.
Cedar Hills, UT 84062
paullewisut@gmail.com
801-830-8735

To whoever it may concern,

I don't really know how to write this letter or even where to start, but my dad is a great man. He has been there for me my whole life, and through the hardest times he would comfort me and tell me it would all be okay. He has been my best friend, my milk shake buddy, and my jam session partner. He has made me the person I am today. Without him I wouldn't be an overachieving student, and I most definitely wouldn't have the confidence and drive I have to do my best. After my parents divorce he was there to talk to when I was sad. He helped me build a good relationship with my mother. For as long as I can remember it has been me and him. A single dad with a young child that he needed to care for. I've lived with him full time without any breaks for more than half my life. He always made sure I had every little thing I wanted. He was my biggest cheerleader with everything I did, whether it was soccer or cheer or dance he was always there. He is the best dad anyone could ever ask for. To give you an idea of the kind of person he raised me to be I could tell you that I'm a 4.0 student, and I take all honors classes. I could tell you that he has raised me to be a leader as I served on student council last year and on my local youth city council as a secretary. I could tell you that he has taught me to be involved and make good friends as I played a high level of competitive soccer. I could tell you that he has taught me to have a big heart and to care for people and always be kind. My father has had more trials in his life than anyone else I know. He has been through 3 failed marriages, lots of career changes, and now this. But even after all of this adversity he has remained the same caring person that will pull over on the side of the road to help a stranger fix their tire. He gives me the best friendship advice, and supports my decisions. So to whoever is reading this letter, please do everything in your power to help me keep my best friend, because I need him in my life. I need him to be there to send me to my first date, and approve of the boy I like. I need him to be able to send me to my first high school dance. I need him to be there when I can't figure out a math problem. I need him to calm me down when I get anxiety about school. I need him to cheer me up when I get sad. I need him to be there to talk about every little thing that happened at school on our drive home. I need him to be there at my graduation. I need him to be able to do the things every other dad can do. I need him in my life. So please I am begging you don't take him away from me. I get that he made a mistake, but everyone makes mistakes its what makes us human. He's not a danger to anyone, so locking him up isn't going to do anything except ruin his life and tremendously affect mine. Because if you lock him up I wouldn't be able to attend the High School I am enrolled in. I wouldn't be able to stay close to my friends. I would have to move far away and live with my mother and go to a complete new school in a place I'm not even familiar with, a place that's not my home. But you wouldn't only be affecting my life. You would affect my brothers, sisters, nieces, nephews, and even my dog. So please when you're making your decision, or playing your part in this process, please consider not only me but all of them too.

Family Contacts:

Christin(daughter) and Steven Larsen

4818 East Kaylee Ct

Eagle Mountain, UT 84005

801-358-2887

Taia Welch (daughter)

Lives with Christin

801-368-6831


Jordan(daughter) and Sete Aulai

2553 South Honeysuckle Dr

Saratoga Springs,  UT 84045


Shae Welch (Son)

801-441-8848